**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., | |
| Plaintiff, | Case No. |
| v. | |
| WILLIAM MCCLURE, BENEFIT LOGISTICS CAPTIVE INSURANCE COMPANY, BENEFIT LOGISTICS, INC., BENEFIT RISK ADVISORS INC., and MCCLURE BENEFIT ADMINISTRATORS, INC. D/B/A MBA TPA, | |
| Defendants. | |

## COMPLAINT AND JURY DEMAND

Plaintiff American International Group, Inc. ("AIG"), for its Complaint against Defendants William McClure ("McClure"), Benefit Logistics Captive Insurance Company ("BLCIC"), Benefit Logistics, Inc. ("Benefit Logistics"), Benefit Risk Advisors Inc. ("Benefit Risk"), and McClure Benefit Administrators, Inc. d/b/a MBA TPA ("MBA TPA," and collectively "Defendants"), hereby states as follows:

## NATURE OF THE ACTION

1. This case involves at least two fraud schemes by Defendants to issue counterfeit insurance policies and certificates of insurance to defraud the public in

connection with captive insurance programs. An injunction is necessary, and has been requested, to end the schemes and protect AIG and the public from further harm.

2. AIG is a publicly traded insurance holding company whose direct and indirect subsidiaries are leading global insurance companies that offer a diverse range of insurance products and services. AIG owns federal registrations for the service marks AIG and AMERICAN INTERNATIONAL GROUP (the "AIG Marks") for use in connection with these products and services.

3. In early January 2025, McClure contacted AIG to explore working with AIG on "fronting" programs for clients of his captive insurance company, BLCIC. In the insurance industry, "fronting" refers to an arrangement in which a licensed insurer (like the AIG subsidiaries that are licensed by states to issue insurance policies) issues an insurance policy on behalf of a self-insured organization or captive insurer. A captive insurance program generally cannot operate without a "fronting" insurer except in the unusual instances where the captive is licensed by a state to issue insurance policies.

4. AIG had preliminary correspondence with McClure. McClure provided some limited background documents regarding BLCIC. AIG requested more specific and detailed information about BLCIC and the potential captive insurance program, but McClure failed to respond to AIG's requests.

5. AIG closed its files on McClure and BLCIC in late January 2025. Through these communications, no agreement of any kind was reached between the parties, and no authority was provided to McClure to allow him to offer insurance, issue policies of any kind, or otherwise bind or obligate AIG or any licensed AIG subsidiary in any way.

6. Rather than undergo AIG's standard vetting process to obtain a legitimate fronting agreement, McClure simply circumvented the process and fraudulently represented to BLCIC's clients that he either held the "power of the pen" for AIG, meaning that he had the authority to bind and issue policies on AIG's behalf, or had such deep relationships with AIG, he could swiftly set up a captive program with AIG. In fact, McClure had no business relationship with AIG at all, much less the power of the pen to bind AIG or to issue policies on AIG's behalf.

7. Nonetheless, in the first fraud scheme (the "Ragnar Scheme," involving fraudulent policies issued to restaurants and bars in South Carolina), McClure issued, or caused to be issued, at least ten "master" insurance policies and fourteen certificates of insurance ("COIs")[1] identifying AIG or AIG Property Casualty Company ("AIG PCC," a subsidiary of AIG licensed to issue insurance policies under the AIG Marks) as an insurer or reinsurer on captive insurance programs run

---

[1] A master policy is the entire contract, that is, a comprehensive legal document defining the agreement between the insurer and the insured. A COI is a summary of the key information from a master policy, used primarily to demonstrate that insurance coverage exists to a third party.

by McClure and his companies.  In the second fraud scheme (the "Landmark Scheme," involving fraudulent policies issued to an enterprise that operates restaurants, catering facilities, and event venues in New Jersey and Pennsylvania), McClure issued an additional master policy and COI purporting to be issued by AIG or AIG PCC.  The coverage allegedly provided by the fraudulent policies varied between the two schemes, with the principal difference being that the Ragnar Scheme was directed at providing liquor liability coverage to numerous bars and restaurants largely in South Carolina, whereas the Landmark Scheme was directed to a single entity which operated in multiple locations in New Jersey and Pennsylvania.

8. Upon information and belief, both fraud schemes are ongoing.  Once McClure was caught misrepresenting AIG's role in already-issued counterfeit policies and COIs, he has either continued to insist that the policies and COIs are fully valid or represented to insureds that Tokio Marine is the actual insurer, which, upon information and belief, is untrue.  To this day, McClure continues to deny any wrongdoing and shift blame to others.

9. Neither AIG nor AIG PCC—nor any of their affiliates or subsidiaries—authorized McClure or his companies, or anyone else, to use AIG's name—or the name of any of AIG's subsidiaries, including AIG PCC—on any policies or COIs. The policies and COIs issued by and/or based upon McClure's instructions were

counterfeits. Indeed, to the extent the policies and COIs purported to represent that AIG (and not one of its licensed subsidiaries like AIG PCC) was the issuing insurer, that was not only false but impossible. AIG is not a licensed insurance company that issues policies. It is an insurance holding company.

10. McClure, or those under his direction, tricked every holder of these counterfeit insurance policies into believing that, if a loss occurred, a company affiliated with AIG would pay the claim. But that was not true, as *every policy and COI at issue was a counterfeit*. In reality, claims would be paid only if McClure and his companies decided to pay them and had sufficient funds to do so.

11. McClure went to great lengths to hide his fraud and was successful in his deceit—until he got caught. Once the frauds were exposed, McClure tried to conceal his fraud in the Ragnar Scheme by falsely telling his clients (in writing no less) that the fronting agreement with AIG was all but finalized when a competitor or disgruntled former employee tortiously interfered with his longstanding relationship with AIG to form a competing captive insurance program. That rationale for issuing the counterfeit policies was false and contrived to hide his wrongdoing. And even after the jig was up, McClure continued to assert that the counterfeit policies and COIs are valid, stating plans to reissue the documents with Berkshire Hathaway and/or Tokio Marine as the fronting insurers. McClure made similar excuses in the Landmark Scheme, telling his clients, once his lies were exposed, that despite AIG's

or AIG PCC's name appearing on the counterfeit documents, Tokio Marine was the actual insurer and that the policies were valid.

12. Defendants' conduct is plainly unlawful and fraudulent.  By using AIG's registered trademarks to issue counterfeit policies, Defendants violated the Lanham Act, which prohibits the unauthorized use of AIG's marks and imposes the harshest punishments in counterfeiting schemes like those here.

13. Defendants also caused others to violate the Lanham Act by directing them to issue insurance policies and COIs bearing AIG's registered trademarks and by misrepresenting that AIG authorized the issuance of the policies and COIs.

14. Upon information and belief, McClure and his companies have issued counterfeit insurance policies bearing AIG's registered trademarks in connection with other fraudulent insurance programs.

15. The Lanham Act specifically authorizes this Court to issue appropriate immediate injunctive relief to protect AIG's trademark interests and put an end to these insidious fraud schemes.  In addition to violating federal trademark law, Defendants are liable under state laws designed to prevent and punish unfair competition.  AIG seeks immediate injunctive relief to stop Defendants' fraud schemes, recover damages for the harm inflicted on AIG, and protect the public from confusion arising out of Defendants' actions.

## JURISDICTION AND VENUE

16. This Court has federal subject matter jurisdiction over AIG's federal claims under Section 39 of the Lanham Act (15 U.S.C. § 1121) and 28 U.S.C. §§ 1331 and 1338, and under 28 U.S.C. § 1332 as there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17. This Court has supplemental jurisdiction over AIG's state and common law claims under 28 U.S.C. § 1367(a) because they form part of the same case and controversy and derive from a common nucleus of operative facts.

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to AIG's claims occurred in this District as McClure and his companies are based in St. Augustine, Florida, and much of their fraudulent activity occurred there.

19. This Court has personal jurisdiction over McClure because he is domiciled in Florida, residing at 6905 Richards Place, St. Augustine, Florida 32080.

20. This Court has personal jurisdiction over BLCIC because it is located, domiciled, doing business, and otherwise found in Florida.

21. This Court has personal jurisdiction over Benefit Logistics because it is located, domiciled, doing business, and otherwise found in Florida.

22. This Court has personal jurisdiction over Benefit Risk because it is located, domiciled, doing business, and otherwise found in Florida.

23. This Court has personal jurisdiction over MBA TPA because it is located, domiciled, doing business, and otherwise found in Florida.

## PARTIES

24. Plaintiff, American International Group, Inc., is a Delaware corporation with its principal place of business at 1271 Avenue of the Americas, New York, New York 10020.  AIG is a publicly traded insurance holding company that directly and indirectly owns numerous licensed insurance companies to which it licenses use of the AIG Marks.  AIG is not a licensed insurer and does not issue insurance policies.

25. Defendant William McClure is a Florida resident, residing at 6905 Richards Place, St. Augustine, Florida 32080.

26. Defendant Benefit Logistics Captive Insurance Company is a Utah corporation with its principal place of business at 700 Plantation Island Drive South, Suite 101, St. Augustine, Florida 32080.  BLCIC is owned and/or controlled by McClure.

27. Defendant Benefit Logistics, Inc. is a Florida corporation with its principal place of business at 700 Plantation Island Drive South, Suite 101, St. Augustine, Florida 32080.  Benefit Logistics is owned and/or controlled by McClure.

28. Defendant Benefit Risk Advisors Inc. is a Florida corporation with its principal place of business at 700 Plantation Island Drive South, Suite 101, St. Augustine, Florida 32080.  Benefit Risk is owned and/or controlled by McClure

29. Defendant McClure Benefit Administrators, Inc. d/b/a MBA TPA is a Florida corporation with its principal place of business at 700 Plantation Island Drive South, Suite 208, St. Augustine, Florida 32080.  MBA TPA is owned and/or controlled by McClure.

30. BLCIC, Benefit Logistics, Benefit Risk, and MBA TPA are collectively referred to herein as the "McClure Companies."

## STATEMENT OF FACTS

### A.    AIG Is a Leading Global Insurance Organization

31. AIG is a publicly owned insurance holding company and one of the largest underwriters of commercial and industrial insurance in the United States, with assets currently exceeding $161 billion and total revenue in 2024 exceeding $27 billion. Its numerous subsidiaries provide a diverse range of insurance products.

32. Since 1968, AIG has continuously and exclusively used the AIG Marks, AIG and AMERICAN INTERNATIONAL GROUP, in interstate commerce throughout the United States in connection with the advertising, promotion, and sale of a wide variety of insurance products and services.  Attached as Exhibit 1 are true

and accurate copies of printouts from the AIG website that show AIG's historic and current use of the AIG Marks, including for captive insurance services.

33. The United States Patent and Trademark Office has issued AIG numerous registrations on the Principal Register for the AIG Marks, including the following:

| Trademark | Reg. No. | Reg. Date | Services |
|---|---|---|---|
| AIG | 1,172,557 | October 6, 1981 | Insurance underwriting services |
| AIG | 2,320,184 | February 22, 2000 | Underwriting services, namely, aircraft, property and casualty and life; insurance and insurance-related services rendered to corporate and other commercial and individual clients, namely, insurance management services, self-insurance services, actuarial services, pension fund administrative services, loss adjustment services; insurance and insurance related services rendered to insurance company clients, namely, reinsurance services and loss adjustment services; securities broker-dealer services; pension and investment-fund management; provision of guarantees and surety, of loans and credit, investment consultation; investment management; investment advisory services; investment management services and related advisory services in |

| | | | connection with direct equity funds; mutual fund investment, brokerage and distribution; management of real estate, and the leasing thereof; real estate mortgage-lending services; insurance-related financial services rendered to commercial and individual clients, namely, installment loan services; financial management and administration of health care plans for others |
|---|---|---|---|
| AMERICAN INTERNATIONAL GROUP | 2,376,437 | August 15, 2000 | Underwriting services, namely, automobile, property and casualty, life, investment advisory services |

34. True and accurate copies of the certificates of registration for each of the above registrations are attached hereto as Exhibit 2.

35. The federal trademark registrations identified above are valid and subsisting in law, were duly and legally issued, are prima facie evidence of the validity of the marks registered, and constitute constructive notice of the ownership of the marks by AIG in accordance with Sections 7(b) and 22 of the Trademark Act of 1946, 15 U.S.C. §§ 1057(b) and 1072.

36. Each of the above registrations is incontestable pursuant to Section 15 of the Trademark Act of 1946, 15 U.S.C. § 1065, and, pursuant to Section 33(b) of the Act, 15 U.S.C. § 1115(b), constitute conclusive evidence of AIG's exclusive right to use the registered mark in commerce in the United States.

37. AIG has spent millions of dollars over the years promoting and marketing its goods and services under the AIG Marks, and AIG and its services have received enormous publicity throughout the United States. Consequently, the AIG Marks are famous throughout the United States, and insurance products and services sold under the AIG Marks are recognized by the insurance brokerage community and the consuming public as being associated with AIG alone.

38. By virtue of its adoption and long-continuous use and promotion of the AIG Marks, AIG has acquired valid trademark rights in and to the marks, and AIG is the sole owner of such rights.

39. Through widespread and favorable public acceptance and recognition, the AIG Marks are assets of substantial value to AIG as symbols of AIG, its quality products and services, and goodwill.

40. AIG licenses the AIG Marks to its subsidiaries for use in connection with the offering of insurance products and services throughout the country, including insurance and reinsurance services related to captive insurance companies. One of these subsidiaries is AIG PCC.

### B.    Captive Insurance

41. This case involves an area of insurance known as "captive insurance." Captive insurance programs are complex, multi-party arrangements that require specialized expertise and significant underwriting capacity.

42. In the type of captive insurance program at issue here, an insurance broker or other company (the "Broker/Owner") typically forms and owns a captive insurance company (the "Captive"). The Captive is ultimately responsible for paying some or all the losses on policies sold by the Broker/Owner, depending on the specifics of the arrangement.

43. Because Captives are usually not licensed direct insurers, the Broker/Owner must engage a commercial insurer (such as an AIG subsidiary) (an "Issuing Carrier") to issue the insurance policies to be sold, and then reinsure such policies to the Captive. The apportionment of risk between the Issuing Carrier and the Captive is typically documented in a reinsurance or "fronting" agreement through which the Captive (as the reinsurer) agrees to reimburse the Issuing Carrier for some of or all the losses incurred under the policies.

44. Typically, the Captive pays the Issuing Carrier a fee or commission payment for acting as the Issuing Carrier. In addition, the Captive provides sufficient collateral to the Issuing Carrier to secure, among other things, the Captive's obligation to reimburse the Issuing Carrier for some or all (depending on the agreement) reinsured losses that the Issuing Carrier incurs.

45. These complex transactions are often facilitated by a "captive intermediary," an entity that assists a Broker/Owner in developing an actuarial model and business plan, forming the Captive, and—most importantly—identifying

13

an Issuing Carrier to issue the policies to be sold by the Broker/Owner and reinsured to the Captive. BLCIC, which McClure founded in Utah in March 2024, is such a captive intermediary.

### C.    The Ragnar Scheme

46. Andrew Reina ("Reina") is an insurance broker based in Charleston, South Carolina with a background primarily in wealth management.

47. In or around December 2023, Reina began exploring the idea of forming a captive insurance company to provide liquor liability and other insurance for bars and restaurants, first in South Carolina where Reina was located and then in other states, including New York.

48. Reina had no previous experience in captive insurance, so after reviewing the South Carolina Department of Insurance ("SC DOI") website, he contacted state-approved captive manager CIC Services, LLC ("CIC Services").

49. Around May 14, 2024, Reina began working with Shawn Holland ("Holland") of CIC Services to form a captive insurance company.

50. During this process, Reina was told that he would need sufficient commitments from potential insureds totaling at least $10 million in premiums to get large insurers to consider participating in the captive program.

51. Reina spent approximately five months traveling around South Carolina pitching his prospective captive to potential insureds and attempting to build a $10 million book of premiums.

52. On or around October 29, 2024, Holland introduced Reina to McClure.

53. McClure claimed that he would be able to get Reina's captive program, the "Ragnar Insurance Program," up and running by February 1, 2025 without needing $10 million in premiums.  A true and accurate copy of an email chain in which Holland summarizes McClure's representations is attached as Exhibit 3.[2]

54. McClure represented to Reina that he had the underwriting pen of Berkshire Hathaway, meaning that McClure was able to bind Berkshire Hathaway to insurance policies and issue policies on Berkshire Hathaway's behalf without Berkshire Hathaway's approval.   Upon information and belief, McClure's representation was false.

55. In or around December 2024, based primarily on McClure's representations about having Berkshire Hathaway's underwriting pen, Reina agreed to work with McClure and McClure's company, BLCIC, to form Reina's captive insurance company, Ragnar Hospitality Insurance Company ("Ragnar Hospitality"),

---

[2] Redactions to email exhibits are to protect personal information, confidential information, and/or information that is protected from disclosure by the attorney-client privilege or the work-product doctrine.

which was owned by another one of Reina's companies, Ragnar Captive Management, LLP ("Ragnar Captive").

56. On December 17, 2024, Holland sent Reina an engagement letter, a captive formation agreement, an invoice for a feasibility analysis and risk assessment, and a confidentiality and non-disclosure agreement from an entity called Competitive Edge Risk Solutions ("CERS"). McClure had told Reina that CERS was a marketing company that he owned with two other individuals named Ron Roth ("Roth") and Joe Tucciarone ("Tucciarone").

57. In an effort to get his captive program off the ground and, as instructed by McClure, Reina ultimately paid McClure $25,000 for a feasibility study, $25,000 to register Ragnar Hospitality as a captive cell in Utah that was sponsored by BLCIC[3], and $125,000 as additional capital for the captive.

58. In or about early January 2025, Reina sought to review the sample insurance policy documents to show the potential insureds. But McClure was unresponsive to Reina's requests and did not provide him any documents.

---

[3] A captive insurance company "cell" is a distinct, self-contained unit within a larger captive insurance structure. This cell structure allows multiple organizations to share the infrastructure of the parent captive, while also allowing each cell to operate independently within the larger structure, with its own assets and liabilities.

### D.    McClure Attempts to Solicit AIG's Participation in His Captive Insurance Program

59. On January 10, 2025, McClure emailed Todd C.J. Donovan ("Donovan"), Senior Vice President/Head of North America Fronting at Risk Specialists Companies Insurance Agency, Inc. ("RSCIA," another AIG subsidiary), who has managerial oversight of AIG's North America Fronting Unit.  McClure wrote to Donovan that he was "looking for a fronting agreement" for his captive, BLCIC. McClure represented to Donovan that BLCIC currently had "about 10 million in premiums for commercial auto, gl, WC, property, and cargo.  Our retention level is $1000000 aggregate and we've never filed a stop loss claim in 5 years."  A true and accurate copy of this email chain is attached as Exhibit 4.

60. Over the next two weeks, Donovan and Tina Dover ("Dover"), Assistant Vice President of North America Fronting at RSCIA and an underwriter on Donovan's team, had high-level, preliminary correspondence with McClure about BLCIC.  Dover emailed McClure on January 22, 2025:

> In order for us to underwrite your program we will need the following information:
>
> - 3 years of audit financials for the insured (Captive parent)
> - 3 years audited financials for the Captive (or proforma if this will be a new captive)
> - Copy of the Captive license
> - 5 years of loss runs
> - Historical exposure information
> - Outside actuarial funding study if available
> - Specifications for the desired policy forms.

Exhibit 4 at 3.

61. McClure responded to Dover's request by providing some background documents relating to BLCIC, including a letter from the NAIC purportedly verifying BLCIC's NAIC company code and group code, a "Certificate of Existence" for BLCIC from the Utah Department of Commerce, a "Certificate of Authority" for BLCIC from the State of Utah Insurance Department, a Risk Assessment and Captive Analysis Report prepared by CIC Services, and a Feasibility Analysis prepared by Pinnacle Actuarial Resources. True and accurate copies of this email and the attachments are attached as Exhibit 5.

62. Those documents provide information about some of McClure's "wholly owned" companies. Exhibit 5 at 12 (Risk Assessment). Benefit Logistics is described as providing "pooled health, life, dental, and vision insurance and retirement plans to a group of over 500 small privately-owned businesses across the United States, with FL, GA, NC, and NY being significant markets." *Id.* MBA TPA is described as "a third-party administrator that helps small businesses operate self-funded high deductible health and benefit plans." *Id.* Benefit Logistics reportedly comprises half of MBA TPA's revenues and is BLCIC's manager. *Id.*; Exhibit 5 at 30 (Feasibility Analysis).

63. McClure told Dover that "to start we want to just insure our Captive Company, [BLCIC] for GL and Property for no more than $25 million total . . . . So,

it would be just one policy.  I would like to start with this and then move into others."

Dover requested a call to discuss, and she and McClure spoke on January 28, 2025.

Exhibit 4 at 1.

64. McClure said he would send the financials that Dover requested, but he did not respond with any additional information.  Accordingly, McClure and AIG never executed a fronting agreement (or any other agreement), and AIG closed its files on McClure and BLCIC in late January 2025.

65. In the course of these discussions, AIG never provided any authority to McClure to allow him to offer insurance, issue policies of any kind, or otherwise bind or obligate AIG or any licensed AIG subsidiary in any way.  AIG never agreed to underwrite or reinsure any insurance policy or program for McClure or the McClure Companies.

### E.   The Ragnar Scheme Is Launched

66. On or about January 15, 2025, Holland emailed Reina and reported that McClure "has been working diligently with various companies and AIG is the only company willing to work with this line of business."  Holland further stated that "AIG has a proposal on their desk, but we cannot force them to move to the top of the pile to get this done."  Holland outlined a "risk stack" (that is, layered insurance) for any potential policy issued to a potential insured, in which the potential insured would have a deductible, followed by coverage to be provided, in order, by Reina's

companies, the McClure Companies, and then AIG. A true and accurate copy of this email chain is attached as <u>Exhibit 6</u>.

67. By late January 2025, Reina had not received a feasibility study, any captive formation documents for Ragnar Hospitality, any insurance policy documents, or anything else from McClure.

68. On or about January 31, 2025, Reina met with McClure in New York to discuss Reina's concerns. Roth and Tucciarone were also at the meeting.

69. During the meeting in New York, McClure told Reina that Berkshire Hathaway was only willing to front and reinsure up to $5 million per policy for the Ragnar Insurance Program, while AIG would front and reinsure up to $25 million per policy. McClure further claimed that based on his supposedly longstanding relationship with AIG, AIG would underwrite the program and only require $250,000 in collateral. In truth, McClure had no relationship with AIG, and AIG had not agreed to underwrite the program.

70. Based upon McClure's false representations, Reina told his clients that the Ragnar Insurance Program would be backed by AIG, and many of his clients agreed to participate in the program for that reason. Upon information and belief, Reina was unaware of the falsity of his statements and made them based on McClure's assurances and representations.

71. On February 6, 2025, McClure emailed Reina: "We are just about finished with your master policy, It should be ready to send to you tomorrow.  Although the policy will stay the same, the policy numbers for each client will be different.  We will issue those to you."  A true and accurate copy of this email chain is attached as Exhibit 7.

72. Despite McClure's assurances that he would send the master policy on February 7, 2025, McClure did not send Reina the master policy that day.

73. Five days later, on February 12, 2025, McClure emailed Reina a master policy, signed by McClure and purportedly issued by BLCIC, listing "AIG Reinsurance" as providing a layer of commercial general liability coverage.  There is no actual AIG company called "AIG Reinsurance."   But by adding "AIG Reinsurance," McClure falsely represented that AIG was participating in the Ragnar Insurance Program.

74. McClure also instructed Reina by email: "From Here, I just need you to make the adjustments on the policies [sic] documents for coverage levels, add the named insured on the COI (you can generate but send to us to proof), and send to me for final approval for pricing.  So really you will have 3 sets of Documents ready to go based on coverage levels."  True and accurate copies of this email chain and the attachments are attached as Exhibit 8.

75. On February 13, 2025, McClure directed Reina that "[t]he COI needs to have 19402 as NAIC number for AIG[.]  And it needs to have Insurer B on there: Benefit Logistics Captive Insurance Company NAIC number 17633."  A true and accurate copy of this email chain is attached as Exhibit 9.  Under this form of counterfeit policy, AIG as "Insurer A" purportedly would be the primary insurer— even though AIG is not a licensed insurance company itself and AIG did not agree that any of its subsidiary writing companies would be part of this captive program.

76. 19402 is the NAIC number for AIG PCC (not AIG, as McClure represented in his email).

77. Upon information and belief, BLCIC is not registered with the National Association of Insurance Commissioners ("NAIC"), and there is no entity with NAIC number 17633.[4]

78. By this time, February 13, 2025, the Ragnar Scheme was underway. McClure had convinced Reina that AIG was underwriting the Ragnar Insurance Program.  In fact, however, AIG had no role in the Ragnar Insurance Program at all.

79. After Reina pointed out that the master policy excluded liquor liability from coverage even though liquor liability coverage was the primary purpose of the insurance program, McClure sent Reina an updated master policy.  McClure told

---

[4] The NAIC's website does not list BLCIC as having an NAIC number.  *See* https://content.naic.org/sites/default/files/publication-loc-zu-listing-companies-summary.pdf

Reina to send the COIs to insureds "[o]nce they pay binder," that is, make a premium payment. True and accurate copies of this email chain and the attachments are attached as Exhibit 10.

80. On February 18, 2025 at 1:57 p.m., McClure advised Reina, "Jim Greene is our accounting dept who will issue the bills to each entity." A true and accurate copy of this email chain is attached as Exhibit 11.

81. Later that day, at 2:37 p.m., McClure emailed Reina and Greene (who has a MBA TPA email address), instructing Greene to issue invoices. McClure explained, "When Andrew [Reina] gets the list updated, we will begin the process of creating invoices for each establishment (co). Each one will have their invoices to read as follows: Captive Setup Fee $10,000.00 (Paid by Ragnar) so NET $0, the monthly General Liability Premium (Annual Premium / 12), the Reserve Fee (1 of 1) of $1,000.00, and the premium finance fee." A true and accurate copy of this email chain is attached as Exhibit 12.

82. On February 24, 2025, McClure again described the process for issuing insurance policies and COIs stating: "Samantha and Kimberly [of MBA TPA], we will assign the following Policy numbers to Ragnar Captive Assurance [sic] Co. Andrew [Reina] will send the COI's just for a quick email of approval. He is very skilled at COI's so we can let him do this. Andrew, Our Policy numbers for you will be as follows: RCAC-GL-00001-(4 characters you determine that Identify the name

of the restaurant) RCAC-GL-00002-(4 characters you determine that Identify the name of the restaurant) Etc." McClure instructed Reina to send the first three COIs to MBA TPA for approval. True and accurate copies of this email chain and the attachments are attached as Exhibit 13.

83. Reina, not aware that McClure was defrauding him and Reina's clients, brought McClure and BLCIC 289 potential insureds for the Ragnar Insurance Program. Of these, 70 potential insureds—69 bars and restaurants in South Carolina and one in New York—were part of an initial set of potential insureds to be offered policies through the Ragnar Insurance Program starting in or around February 2025, when these 70 potential insureds would decide whether to renew their existing insurance policies that were coming up for renewal, or join the Ragnar captive program.

84. McClure calculated the premium amounts for potential insureds, and the potential insureds who agreed to purchase policies began making premium payments to an account associated with MBA TPA.

85. Upon information and belief, at least three purported insureds—Fairplay Entertainment Services Inc., Roots 2 LLC, and SS17 LLC (all bars and restaurants in South Carolina)—made premium payments directly to MBA TPA.

86. Based on McClure's false representation that AIG was the Issuing Carrier, and at McClure's direction, Reina and Travis Brewster (Vice President of another of

Reina's company, The Edmund Andrew Company LLC ("Edmund Andrew")[5] proceeded to issue ten master insurance policies and fourteen COIs to a total of fourteen bars and restaurants in South Carolina (all on the initial list of 70 potential insureds) that identify "AIG Reinsurance" as providing a layer of coverage in each master policy and identify "Insurer A" as "American International Group (AIG)" in each COI. Each master policy bears McClure's signature. Below is an example of McClure's signature on a master policy:



**THIS ENDORSEMENT AUTHORIZES THE POLICY.**

**AUTHORIZATION AND ATTESTATION**

This endorsement authorizes the insurance contract between you and the insurance company subsidiary listed on the DECLARATIONS PAGE of your insurance policy.

In Witness Whereof, this page executes and fully attests to this policy. If required by state law, the policy shall not be valid unless countersigned by our authorized representatives.

Authorizing signatures

William McClure

President

---

[5] Reina's three companies, Ragnar Hospitality, Ragnar Captive, and Edmund Andrew, are collectively referred to hereinafter as the "Reina Companies."

87. And this is an example of a master policy's unauthorized use and infringement of the "AIG" Mark:



**Commercial General Liability Coverage Overview**

| Company | Policy No | Effective Date | Expiration Date |
|---|---|---|---|
| Each Company | RCAC-GL-00039-SBUV | 03/30/2025 | 03/30/2026 |
| Ragnar Captive Assurance Company | RCAC-GL-00039-SBUV | 03/30/2025 | 03/30/2026 |
| Benefit Logistics Captive Insurance | RCAC-GL-00039-SBUV | 03/30/2025 | 03/30/2026 |
| AIG Reinsurance | RCAC-GL-00039-SBUV | 03/30/2025 | 03/30/2026 |

| Description of Limits | Primary Client Deductible | Secondary RCAC Coverage | Reinsurance Coverage | Limits of Insurance |
|---|---|---|---|---|
| Each Occurrence | $10,000.00 | $10,001.00-$25,000.00 | $25,001.00-$250,000.00 | $ 250,000 |
| General Aggregate Limit | $50,000.00 | $50,001.00 -$100,000.00 | $100,001-$1,000,000.00 | $ 1,000,000 |

*AIG's registered trademark*

88. As an exemplar of these master policies, a true and accurate copy of the master policy issued to The Ax Hole LLC d/b/a The Bearded Dragon is attached as Exhibit 14. Also, as an exemplar of these COIs, a true and accurate copy of the COI issued to Fairplay Entertainment Services, Inc. is attached as Exhibit 15.

89. All these insurance policies and COIs are counterfeits because they purport to bind AIG to provide coverage when in fact, AIG had no involvement in the captive program and no knowledge that these policies or COIs were being issued, and did not provide McClure, Reina or anyone else with authority to represent that AIG was providing such coverage or even a party to such policies. And, as explained above, "AIG Reinsurance" is not an actual AIG company, AIG is not a licensed

insurer (it is an insurance holding company), and the NAIC number listed on the COIs for AIG is actually assigned to AIG PCC. These falsities in the master policies and COIs evidence McClure's lack of knowledge of AIG's business and any legitimate relationship with AIG, as well as his plain intent to convey to third parties that AIG was participating in the Ragnar Insurance Program.

90. Significantly, the COIs, all of which were issued to South Carolina bars and restaurants, are a fraud on the public for another reason. Under South Carolina law, a captive insurer cannot issue an insurance policy unless state regulators license the captive to do so after a rigorous review process. None of the McClure Companies were licensed to issue insurance policies or COIs in South Carolina (which is why they needed an Issuing Carrier). Yet, in violation of law, the COIs not only infringe on AIG's Marks but also identify Benefits Logistics as an insurer (with a fake NAIC number no less). The below is typical of the COIs (highlighting added):



91. The COIs alone thus represent not only trademark infringement but a trifecta of frauds. First, Benefits Logistics is not a licensed insurer and hence, it was fraudulent for it to identify itself as an insurer. Second, making up a NAIC number for Benefits Logistics was fraudulent. And third, identifying AIG as an insurer was fraudulent as AIG is not a licensed insurer and was never part of this insurance program. The entire Ragnar Insurance Program is a sham.

92. As a result of these fraudulent policies and COIs, at least fourteen bars and restaurants in South Carolina that were on the initial list of 70 potential insureds coming up for renewal of their existing commercial insurance policies did not renew their policies with their existing carriers and instead, moved to the Ragnar Insurance Program, on the belief that they were getting valid insurance from this Program,

which was in fact a sham. It is possible, and indeed likely, that Defendants issued counterfeit insurance documents to far more than fourteen bars and restaurants in South Carolina. Discovery will reveal how many insureds were victimized by this fraud scheme.

### F.    Reina Becomes Suspicious of McClure and Discovers the Fraud

93. Still lacking definitive captive program documents from McClure and growing concerned about the viability of the Ragnar Insurance Program, on February 20, 2025, Reina prudently contacted AIG's Head of Captive Management, Robert Gagliardi ("Gagliardi") after locating his contact information on the SC DOI's website. Gagliardi informed Reina that he had no knowledge of McClure or BLCIC.

94. On or around February 26, 2025, Reina began speaking with AIG Fraud Investigator Kimberly Giardina ("Giardina" or "AIG Fraud Investigator Giardina"). Reina sent Giardina some documents and communications that he had relating to McClure and the McClure Companies.

95. In or around early April 2025, AIG confirmed to Reina that it had not agreed to front or reinsure any program connected with McClure or the McClure Companies and that it did not authorize McClure, the McClure Companies, or any of their agents, affiliates, or representatives to issue insurance policies or certificates of insurance listing AIG or any of its subsidiaries as an insurer or reinsurer in any capacity.

29

96. Since then, Reina has not issued any insurance policies or COIs containing AIG's name (other than the ten policies and fourteen COIs discussed above) and has held the premium payments collected from the purported insureds in an escrow account. At the time Reina ceased issuing policies and COIs containing AIG's name under the Ragnar Insurance Program, however, policies and COIs for the remaining entities and individuals on that initial list of 70 potential insureds either had been prepared or were in the process of being prepared. It is not known what happened with these counterfeit policy documents, including if any were issued by McClure and his companies to other potential insureds in the Ragnar Insurance Program.

### G.  The Landmark Scheme

97. Roth, a consultant for a captive manager in New York, was introduced to McClure through Christopher Gallo ("Gallo"), who is another member of CIC Services.

98. Landmark Hospitality/LMH Holdings ("Landmark"), a company that operates numerous restaurants, catering facilities, and event venues in New Jersey and Pennsylvania, is a client of Roth and Tucciarone.[6]

99. McClure represented to Roth and Tucciarone that McClure had the "power of the pen" for both Berkshire Hathaway and AIG.

---

[6] Landmark's website lists dozens of bars, restaurants, and event venues it owns or controls. *See* https://bylandmark.com/.

100. Based on McClure's representations, Roth and Tucciarone proceeded with placing the insurance for Landmark with McClure and BLCIC resulting in the issuance of a master insurance policy and a COI, *i.e.*, the "<u>Landmark Insurance Program</u>."

101. The master insurance policy that McClure provided to Landmark indicates that "AIG" or "AIG Reinsurance" is taking a reinsurance layer of $500,001 to $1,000,000 for certain lines and $750,001 to $2,000,000 for others. A true and accurate copy of this master insurance policy is attached as <u>Exhibit 16</u>. Again, AIG is not a licensed insurer and "AIG Reinsurance" is not an actual AIG company.

102. The COI lists "AIG PROPERY [sic] CASUALTY COMPANY" as "Insurer A." The certificate indicates that it was produced by "Benefit Risk Advisors DBA Benefit Logostics [sic] Insurance Agency" and was signed by authorized representative "William A. McClure." A true and accurate copy of this COI is attached as <u>Exhibit 17</u>.

103. McClure instructed Landmark to provide its lenders (banks) with the COI listing AIG PCC as a participating insurer to satisfy loan covenants requiring that Landmark's insurance be with a rated carrier. Landmark showed the counterfeit COI to its lenders.

104. After Roth saw the COI, Roth began to question the legitimacy of McClure and the McClure Companies.

105. Roth asked one of his service representatives, Pamela Romano, to contact AIG and confirm the information on the master insurance policy and COI that McClure provided to Landmark.  Roth also reached out to the Utah Insurance Department to try to gather more information on McClure and BLCIC.

106. When McClure discovered Roth had reached out to AIG, McClure became angry.  On February 19, 2025, McClure sent the following email to Tucciarone:

> I cannot have Pam calling AIG or any of my relationships.
> Apparently she did.
> I called the president of AIG and he said he hadn't received any calls but he is now skeptical of our relationship that I worked on for a year (and paid them $250k deposit for Landmark) because why would anyone call them?  They don't like drama.
> Pam is drama.  Insurance is the protection from catastrophic risk, which she is a liability.
> Fronts don't carry risk, they just hold a reserve and don't take calls on our behalf.  When they get a call it means we have a claim, or we have a problem.

A true and accurate copy of this email chain is attached as <u>Exhibit</u> <u>18</u>.

107. McClure's email to Tucciarone was full of lies.  <u>First</u>, he did not have a "relationship" with AIG.  <u>Second</u>, he did not call "the president of AIG" or anyone else at AIG.  <u>Third</u>, McClure did not pay $250,000 to AIG (he paid nothing to AIG, as AIG was not involved in the program).  McClure sent the above email to mislead Tucciarone into believing that AIG was, in fact, participating in the Landmark Insurance Program and to shut down any further inquiries.

108. McClure's reaction only increased Roth's suspicion.  On or around February 19, 2025, Roth began speaking with AIG Fraud Investigator Giardina.

109. After speaking with Giardina and the Utah Insurance Department, Roth advised Tucciarone and the CEO of Landmark, that he, Roth, doubted McClure's legitimacy, and Roth urged them not to proceed under his program unless and until AIG confirmed that coverage existed.  Tucciarone and Landmark's CEO declined to heed Roth's advice and continued to proceed under McClure's program.

110. On April 9, 2025, after AIG confirmed to Roth that it and its subsidiaries were not participating in the Landmark Insurance Program—or any other program that McClure created—Roth informed Landmark's CFO, Scott Grogan ("Grogan"), that McClure had been misrepresenting AIG's participation in the program.  Roth recommended that Grogan reinstate Landmark's commercial insurance coverage immediately.  A true and accurate copy of this email is attached as Exhibit 19.

111. On or around May 7, 2025, Tucciarone had another meeting with McClure and Landmark's leadership regarding the Landmark Insurance Program. Contrary to his earlier insistence that AIG was backing the program, McClure represented that Tokio Marine would be acting as the fronting and excess carrier. Upon information and belief, to this day, Landmark's many operations believe they have insurance coverage through Benefits Logistics and Tokio Marine, but all they have are counterfeit insurance policies that provide no coverage at all.

33

**H.    AIG Discovers McClure's Fraud Schemes and Takes Action**

112. After Reina's and Roth's outreach, AIG reviewed the master insurance policies and COIs issued in connection with the Ragnar Insurance Program and the Landmark Insurance Program (respectively, the "Counterfeit Insurance Policies" and "Counterfeit COIs").

113. AIG confirmed that it does not have any business or relationship with McClure or the McClure Companies and that all relevant documents bearing the AIG Marks are counterfeits.

114. The policy numbers identified in the Counterfeit Insurance Policies and Counterfeit COIs do not exist in AIG's databases.

115. Upon information and belief, McClure and the McClure Companies have also issued counterfeit insurance policies and/or counterfeit COIs bearing the AIG Marks with respect to other insurance programs.

116. Knowing that his fraud scam was about to be exposed, on April 11, 2025, McClure emailed Dover from AIG, purportedly following up on their January 28, 2025 call in which McClure solicited AIG's participation in his captive insurance program.  McClure stated, "On our last call you were going to send me the packet of information to get started on the Captive Excess program.  Can you send me the documents?"  Dover had not said anything about sending AIG documents to

34

McClure and did not respond to this email.  A true and accurate copy of this email chain is attached as Exhibit 20.

117. On April 11, 2025, AIG (through counsel) sent letters to entities and individuals that appeared to be involved in the Ragnar and Landmark Schemes based on the documents and information that Reina and Roth provided to AIG and its counsel.

118. Most of the letters were identical cease-and-desist letters to McClure and the McClure Companies, Reina and the Reina Companies, and Gallo, warning each of those parties that the Counterfeit Insurance Policies and Counterfeit COIs are fraudulent and demanding that each party refrain from representing to anyone that such documents are valid or enforceable.  As an exemplar of these letters, a true and accurate copy of the cease-and-desist letter sent to McClure is attached hereto as Exhibit 21.

119. On April 21, 2025, AIG (through counsel) sent identical letters to the purported insureds in the Ragnar Scheme of which AIG was aware, warning them that the Counterfeit Insurance Policies and Counterfeit COIs are fraudulent and that AIG did not authorize McClure, the McClure Companies, Reina, the Reina Companies, or any of their agents, affiliates, or representatives to act on AIG's behalf or to issue any insurance policies or COIs listing AIG or any of its affiliates as providing insurance coverage in any capacity.  As an exemplar of these letters, a

true and accurate copy of the letter sent to Tap It Crafts On Drafts is attached hereto as <u>Exhibit</u> <u>22</u>.

120. On April 23, 2025, AIG (through counsel) sent identical letters to Landmark and its related entities, warning them that the Counterfeit Insurance Policies and Counterfeit COIs are fraudulent and that AIG did not authorize McClure, the McClure Companies, Reina, the Reina Companies, or any of their agents, affiliates, or representatives to act on AIG's behalf or to issue any insurance policies or COIs listing AIG or any of its affiliates as providing insurance coverage in any capacity. As an exemplar of these letters, a true and accurate copy of the letter sent to LMH Holdings is attached hereto as <u>Exhibit</u> <u>23</u>.

121. After sending those letters, AIG began receiving responses from the purported insureds expressing surprise that they did not have insurance or reinsurance coverage through AIG or one of its affiliates. A true and accurate copy of one email chain from a holder of a counterfeit policy is attached as <u>Exhibit</u> <u>24</u>.

122. On May 13 and 14, 2025, AIG submitted reports regarding McClure and the McClure Companies' fraud to the relevant state authorities in Florida, New Jersey, New York, Pennsylvania, South Carolina, and Utah.

123. AIG met with regulators from South Carolina and Florida on July 10, 2025 to discuss the fraud reports. In response to these regulators' requests, on July

28, 2025, AIG provided additional information to them regarding its investigation into the Counterfeit Insurance Policies and Counterfeit COIs.

124. On August 19, 2025, AIG received a letter from another purchaser, who explained he was unsure about the status of his coverage as he had (1) continued to pay premiums even after receiving AIG's letter advising him there was no coverage, and (2) received a refund check for his payments. The purchaser also included a list of 152 businesses to whom he sent brochures advertising the Ragnar Insurance Program, only four of which were previously known to AIG and had been sent letters in April 2025. True and accurate copies of this letter and its enclosures are attached as Exhibit 25.

125. On August 20, 2025, AIG called the purchaser to warn him that he did not have coverage with AIG and AIG had not authorized any policy to be issued to him bearing AIG's name. On August 21, 2025, AIG reported this additional information to the South Carolina and Florida regulators. On August 22, 2025, AIG (through counsel) sent identical letters to the 148 businesses that were not previously known to AIG, warning them that the Counterfeit Insurance Policies and Counterfeit COIs are fraudulent and that AIG did not authorize McClure, the McClure Companies, Reina, the Reina Companies, or any of their agents, affiliates, or representatives to act on AIG's behalf or to issue any insurance policies or COIs listing AIG or any of its affiliates as providing insurance coverage in any capacity.

As an exemplar of these letters, a true and accurate copy of the letter sent to Ram Cat Cellars is attached hereto as <u>Exhibit 26</u>.

### I.    McClure's Continued Deception

126. On April 12, 2025, McClure emailed AIG's counsel after receiving the cease-and-desist letter sent to him:

> I'm not sure what this is all about, as we have our own Captive Insurance Company, and our policy language was written by a different Carrier, not AIG, as you will clearly see.
>
> I can only imagine that this is tortious interference from a competitor or disgruntled ex employee, as we were exploring options as to how best to partner with AIG and which of the 3 options were the best path and, in fact, only made one presentation with 3 potential paths to take, all of which were clearly marked "sample".
>
> Again, we operate just fine without AIG.
>
> I'll send this along to our in-house council and our litigation team to begin an appropriate response and to seek discovery.

A true and accurate copy of this email chain is attached as <u>Exhibit 27</u>.

127. AIG's counsel asked McClure to explain why AIG's name appears on the Counterfeit Insurance Policies and Counterfeit COIs signed by McClure and purportedly issued by the McClure Companies.

128. On April 13, 2025, McClure responded:

> All COI's are signed by me as we are the first dollar coverage, even in the case where multiple carriers are involved.
>
> However, Usually, excess carriers (AIG) do not even appear on COI's, so I'll look into that if you can forward me the COI in question.

Your letter also stated a fronting agreement had been provided to a client?  Please provide that as well, as we were only in discussions with AIG as to which programs to use, as AIG didn't cover WC or CA.  We are not in possession of a fronting agreement from AIG, so that accusation is impossible.

I am concerned that these false allegations have jeopardized my business relationship with them.

Exhibit 27 at 1.

129. On April 14, 2025, after the Counterfeit Insurance Policies and Counterfeit COIs had been issued and sent to purported policyholders, McClure sent two emails to Reina, claiming he had scheduled a meeting with AIG for 4:00 p.m. that day:

We were in the process of moving things to AIG (in the case where an A rating was required) from others but Ron Roth decided to start a Captive a [sic] compete with us, and tell AIG we were bad guys…but I've seen this movie before.

I will call you directly.  We have a meeting with our in-house council today at 2pm.  Then with AIG at 4pm.

\*\*\*

All [clients of the Ragnar Insurance Program] are currently covered under insurance.

We are a licensed insurance company and carry the risk.

We currently use many excess carriers (not just AIG), and as such, they are not usually listed on the COI's.

We have a call with AIG later, so I doubt they would send a letter [to the clients] without knowing the facts, and perhaps being liable.

A true and accurate copy of this email chain is attached as <u>Exhibit</u> <u>28</u>.

130. No such meeting between McClure and AIG was scheduled, and no such meeting took place.

131. On April 23, 2025, McClure emailed Reina, "We have reissued the COI's [for the Ragnar Insurance Program] to continue to keep Berkshire Hathaway and Tokyo [sic] Marine as our Excess Carriers, as it seems Ron Roth has started a competing Captive and is the one who started interfering with our deal with AIG. I will send you copies of everything. I had no idea he was doing this, but we are planning a tortious interference case now against Ron Roth." A true and accurate copy of this email chain is attached as <u>Exhibit</u> <u>29</u>.

132. Upon information and belief, McClure and BLCIC have no authority to issue insurance policies or COIs on behalf of Berkshire Hathaway or Tokio Marine, and hence McClure's fraud schemes continue to this day.

133. On May 15, 2025, the Reina Companies sued McClure and the McClure Companies in South Carolina State Court, alleging that McClure defrauded the Reina Companies and the public. A true and accurate copy of that Complaint is attached hereto as <u>Exhibit</u> <u>30</u>.

134. On August 13, 2025, McClure and the McClure Companies filed an answer and counterclaim/third-party complaint against Reina. In the response, McClure continued to deny he and the McClure Companies had acted wrongfully

and continued to try to shift the blame—this time to Reina.  McClure alleged that, while he was working to place the reinsurance with AIG and despite his instructions otherwise, Reina signed COIs and issued them to customers based on sample policy documents.  True and accurate copies of the answer and third-party complaint are attached hereto as Exhibit 31.

## COUNT ONE

### Counterfeiting and Trademark Infringement
### (*Under 15 U.S.C. § 1114*)

135. AIG repeats and realleges paragraphs 1 - 134 above as if set forth fully and verbatim herein.

136. The AIG Marks are inherently distinctive or acquired distinctiveness well before the acts of Defendants complained of herein through long, continuous use in commerce in the United States.  AIG therefore owns valid and enforceable rights in the AIG Marks and is the sole owner of the federal registrations therefor.

137. Without AIG's authorization or consent, Defendants have knowingly used reproductions, counterfeits, copies, and colorable imitations of the AIG Marks in connection with the issuance, offer, and/or sale of the Counterfeit Insurance Policies and Counterfeit COIs.

138. Specifically, without AIG's authorization or consent, Defendants have issued insurance policies and/or COIs thereunder bearing the AIG and/or AMERICAN INTERNATIONAL GROUP marks despite the fact that Defendants

knew full well that AIG had not approved of or underwritten the policies and/or COIs, and despite the fact that each Defendant knew of AIG's well-known and prior rights in the AIG Marks such that they knowingly issued policies and/or COIs they knew to bear counterfeit marks.

139. Defendants' use of the AIG Marks on the Counterfeit Insurance Policies and Counterfeit COIs is likely to cause confusion or mistake and to deceive consumers into believing AIG is the source, issuer, insurer, reinsurer, or underwriter of the Counterfeit Insurance Policies and Counterfeit COIs.

140. Defendants' use of the AIG Marks has caused actual confusion in the marketplace.

141. AIG does not underwrite—and has never underwritten—the Counterfeit Insurance Policies or Counterfeit COIs, did not issue the Counterfeit Insurance Policies or Counterfeit COIs, and did not license or otherwise authorize any Defendant to use the AIG Marks on the Counterfeit Insurance Policies or Counterfeit COIs.

142. Defendants have offered the Counterfeit Insurance Policies and Counterfeit COIs for sale using the AIG Marks. Defendants engaged in this conduct with the intention of trading on AIG's reputation and goodwill and misleading, deceiving, or confusing consumers as to the origin and insurer of the Counterfeit Insurance Policies and Counterfeit COIs.

143. The foregoing conduct constitutes trademark counterfeiting and infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

144. As a direct and proximate result of the foregoing trademark counterfeiting and infringement, AIG has suffered and will continue to suffer irreparable harm to the goodwill of its AIG Marks as well as monetary damages in an amount yet unknown but to be determined at trial.

145. Defendants have unfairly acquired income, profits, and goodwill at AIG's expense.

146. Defendants' acts of trademark counterfeiting and infringement have caused and will continue to cause substantial and irreparable injury to AIG if the Court does not restrain Defendants from further violation of AIG's rights, and AIG has no adequate remedy at law.

147. Based on the foregoing conduct, AIG is entitled to injunctive relief under 15 U.S.C. § 1116 enjoining Defendants from further infringing the AIG Marks.

148. Based on the foregoing conduct, AIG is entitled to all gains, profits, and advantages that Defendants obtained as a result of their unlawful and infringing actions under 15 U.S.C. § 1117.

149. AIG is also entitled to the following from Defendants:

    a.    actual damages or, at AIG's election, statutory damages of up to $2,000,000 per counterfeit mark per type of goods sold, offered for sale,

or distributed, including each type of insurance policy and COI issued, under 15 U.S.C. § 1117; and

b.    reasonable attorneys' fees and costs under 15 U.S.C. § 1117.

## **COUNT TWO**

### **Indirect (Contributory and Vicarious) Trademark Counterfeiting and Infringement (*Under 15 U.S.C. § 1114*)**

150. AIG repeats and realleges paragraphs 1 - 134 above as if set forth fully and verbatim herein.

151. Defendants' use of the AIG Marks on the Counterfeit Insurance Policies and Counterfeit COIs is likely to cause and has caused actual confusion or mistake and deceived consumers into believing that AIG is the insurer, issuer, or underwriter of the Counterfeit Insurance Policies and Counterfeit COIs.

152. McClure orchestrated the counterfeiting scheme and was a moving, active, conscious force behind Defendants' infringement and the infringement perpetrated by Reina and companies associated with him.

153. McClure has the authority to bind the McClure Companies in transactions with third parties.

154. McClure and BLCIC had joint control over the infringing products in the Ragnar Insurance Program and directed the actions of Reina and the Reina Companies.

155. Defendants have caused their agents to manufacture, distribute, issue, or sell the Counterfeit Insurance Policies and Counterfeit COIs without authorization or license from AIG.

156. Defendants intentionally induced their agents, including Reina and companies associated with him, to counterfeit and infringe the AIG Marks and to issue or sell the Counterfeit Insurance Policies and Counterfeit COIs.

157. Defendants entered into a partnership with Reina and the Reina Companies to counterfeit and infringe the AIG Marks and to issue or sell the Counterfeit Insurance Policies and Counterfeit COIs—though Reina and the Reina Companies were unaware of Defendants' unlawful intent and infringing conduct.

158. In the course of this partnership, Defendants directed Reina and the Reina Companies and/or caused them to counterfeit and infringe the AIG Marks and to issue or sell the Counterfeit Insurance Policies and Counterfeit COIs.

159. Defendants provided services to Reina and the Reina Companies in connection with issuing, distributing, or administering the Counterfeit Insurance Policies and Counterfeit COIs that were sold without authorization or license from AIG.

160. Defendants supplied services to Reina and the Reina Companies whom Defendants knew were engaging (albeit unwittingly) in trademark counterfeiting and infringement.

161. The foregoing acts of causing another to manufacture or issue and providing services in connection with issuing, distributing, and administering the Counterfeit Insurance Policies and Counterfeit COIs, and the relationships described above, were necessary to the intentional use of counterfeit marks and trademark infringement.

162. But for Defendants' orchestration of, and involvement in, the counterfeiting scheme, there would have been no Counterfeit Policies or Counterfeit COIs provided to purported insureds in the Ragnar Insurance Program by Reina and the Reina Companies.

163. Defendants' unauthorized actions in interstate commerce as described above constitute contributory and vicarious trademark counterfeiting and infringement under Section 32(1) of the Lanham Act (15 U.S.C. § 1114).

164. As a direct and proximate result of Defendants' contributory and vicarious trademark counterfeiting and infringement, AIG has suffered and will continue to suffer irreparable harm to the goodwill of the AIG Marks as well as monetary damages in an amount yet unknown but to be determined at trial.

165. Defendants have unfairly acquired income, profits, and goodwill at AIG's expense.

166. Defendants' acts of contributory and vicarious trademark counterfeiting and infringement have caused and will continue to cause substantial and irreparable

injury to AIG if the Court does not restrain Defendants from further violation of AIG's rights, and AIG has no adequate remedy at law.

167. Based on the foregoing conduct, AIG is entitled to injunctive relief under 15 U.S.C. § 1116 enjoining Defendants from further contributory and vicarious trademark counterfeiting and infringement.

168. Based on the foregoing conduct, AIG is entitled to all gains, profits, and advantages that Defendants obtained as a result of their unlawful and infringing actions under 15 U.S.C. § 1117.

169. AIG is also entitled to the following from Defendants:

    a.    actual damages or, at AIG's election, statutory damages of up to $2,000,000 per counterfeit mark per type of goods sold, offered for sale, or distributed, including each type of insurance policy and COI issued; and

    b.    reasonable attorneys' fees and costs under 15 U.S.C. § 1117.

## COUNT THREE

### State Common Law Unfair Competition
*(Under the Laws of Florida, South Carolina, New Jersey, and New York)*

170. AIG repeats and realleges paragraphs 1 - 134 above as if set forth fully and verbatim herein.

171. The AIG Marks are inherently distinctive or acquired distinctiveness well before the acts of Defendants complained of herein through long, continuous use in commerce in the United States, and AIG is the sole owner of all rights in and to the AIG Marks.

172. The AIG Marks serve to identify insurance products and services offered by AIG through one of its licensed subsidiaries.

173. Defendants have used and are using the AIG Marks in commerce in connection with the advertising, promotion and sale of insurance policies and COIs without AIG's authorization or consent.

174. Through such knowingly wrongful conduct, Defendants have misrepresented to the general public the origin and source of the Counterfeit Insurance Policies and Counterfeit COIs and created a likelihood of confusion by purchasers as to whether AIG is the source, issuer, and/or underwriter of the Counterfeit Insurance Policies and Counterfeit COIs.

175. Defendants' unauthorized and unlicensed creation, distribution, issuance, and sale of the Counterfeit Insurance Policies and Counterfeit COIs created express and implied misrepresentations that those policies were issued, underwritten, or authorized by AIG, which damages both AIG and the public.

176. AIG does not underwrite the Counterfeit Insurance Policies or Counterfeit COIs and did not license or otherwise authorize Defendants to use the AIG Marks on the Counterfeit Insurance Policies or Counterfeit COIs.

177. Defendants knowingly and willfully reproduced, copied, or imitated the AIG Marks for the express purpose of misleading consumers as to whether AIG or its licensed subsidiaries were the insurers behind the counterfeit policies.

178. Defendants' actions are not only likely to deceive the public as to the source or origin of Defendants' policies but have resulted in actual consumer confusion.

179. Defendants' actions constitute unfair competition, directly, contributorily, and/or vicariously, under the common law of the States of Florida, New Jersey, South Carolina, and New York.

180. As a direct and proximate result of Defendants' unauthorized use of the AIG Marks, AIG has suffered and will continue to suffer monetary damages and loss of goodwill to its marks and names in an amount yet unknown but to be determined at trial.

181. Defendants have unfairly acquired income, profits, and goodwill at AIG's expense.

182. Defendants' unlawful acts have caused and will continue to cause substantial and irreparable injury to AIG if this Court does not restrain Defendants from further violation of AIG's rights, and AIG has no adequate remedy at law.

183. Based on the foregoing conduct, AIG is entitled to injunctive relief, damages sustained as a result of Defendants' unfair competition, all profits and advantages obtained by Defendants as a result thereof, and punitive damages for Defendants' intentional misconduct.

## COUNT FOUR

### Declaratory Relief
### (*Under 28 U.S.C. § 2201*)

184. AIG repeats and realleges paragraphs 1 - 134 above as if set forth fully and verbatim herein.

185. Defendants orchestrated the means by which and/or created, provided, and/or sold the Counterfeit Insurance Policies and Counterfeit COIs to individual policyholders in AIG's names.

186. AIG did not authorize or license Defendants to create, provide, or sell insurance policies and COIs in AIG's names.

187. Defendants caused Reina and the Reina Companies, albeit unwittingly, to create, provide, and/or sell the Counterfeit Insurance Policies and Counterfeit COIs to individual policyholders in AIG's names.

188. A bona fide, actual, present and justiciable controversy exists between AIG and Defendants regarding the issuance of the Counterfeit Insurance Policies and Counterfeit COIs.

189. As a result, AIG seeks an order:

    a.    Declaring that the Counterfeit Insurance Policies and Counterfeit COIs were and are void *ab initio*.

    b.    Declaring that neither AIG nor any AIG-affiliated insurance company is responsible for any claims made under the Counterfeit Insurance Policies, Counterfeit COIs, or any other insurance policies or COIs issued by Defendants; and

    c.    As supplemental relief, directing Defendants to notify all policyholders of the Counterfeit Insurance Policies and Counterfeit COIs and any other policies and COIs bearing the AIG Marks in any form that neither AIG nor any AIG-affiliated insurance company is providing them insurance.

## REQUEST FOR RELIEF

WHEREFORE, AIG requests the following relief:

A.    Judgement in AIG's favor on all their claims;

B.    A preliminary injunction:

    1.    Restraining, enjoining, and prohibiting Defendants, their agents, employees, officers, attorneys, servants, successors, assigns, affiliates, and all persons in privity or in active concert or participation with any of them from:

        a.    Representing to anyone that AIG or any AIG-affiliated insurance company issued or authorized the issuance of any Counterfeit Insurance Policies or Counterfeit COIs with respect to, or is responsible for any loss with respect

to, the Ragnar Insurance Program or the Landmark Insurance Program;

b.    Issuing any additional insurance policies or certificates of insurance bearing the name of AIG or any AIG-affiliated insurance company or the AIG Marks in any form; and

c.    Using in any manner the AIG Marks or any confusingly similar marks or names in offering for sale, selling, distributing, or advertising any and all goods or services, including, but not limited to, all insurance products, insurance policies, certificates of insurance, insurance forms, reinsurance agreements, or any other documents purporting to evidence insurance.

2.    Compelling Defendants, within five (5) calendar days of the date of this Order, to:

a.    In a form suitable to the Court, immediately notify all individuals or entities that received from Defendants the Counterfeit Insurance Policies and Counterfeit COIs or any other counterfeit insurance policies and COIs bearing the AIG Marks in any form that those policies and COIs are not genuine and the recipients do not have insurance under those policies and COIs with AIG or any AIG-affiliated insurance company;

b.    Provide Plaintiff a list of all individuals or entities that received any counterfeit insurance policies and counterfeit COIs from Defendants or their agents and confederates (including without limitation all persons or entities affiliated or associated with the Ragnar Insurance Program or the Landmark Insurance Program), with recipients' full contact information (including physical addresses, email addresses, and phone numbers), and copies of the counterfeit insurance policies and counterfeit COIs the individuals or entities received from Defendants;

c.    Identify all insurance programs in which the Defendants were in any way involved as a reinsurance intermediary,

captive manager, broker, agent, producer, or otherwise in which at any time AIG or any AIG-affiliated insurance company was or is identified as an insurer or reinsurer on such insurance programs; and

d. Place in a separate escrow account in a licensed bank in Florida any premiums or other monies received from the sale of any counterfeit insurance policies bearing the AIG Marks in any form, and to preserve such escrowed funds until further order of the Court and provide sufficient documentation to the Court and AIG concerning the amount and location (e.g. depository institution) of such escrowed funds; and

C. Expedited discovery of Defendants to ascertain the full extent of Defendants' frauds and trademark violations.

D. A permanent injunction:

1. Restraining, enjoining, and prohibiting Defendants their agents, employees, officers, attorneys, successors, assigns, affiliates, and all persons in privity or in active concert or participation with any of them from using in any manner the AIG Marks or any confusingly similar marks or names in offering for sale, selling, distributing, or advertising any and all goods or services, including, but not limited to, all insurance products, insurance policies, certificates of insurance, insurance forms, reinsurance agreements, or any other documents purporting to evidence insurance;

3. Ordering each Defendant to send, by email and mail sent through the United States Postal Service, to each known holder of the Counterfeit Insurance Policies and Counterfeit COIs and any other counterfeit policies and COIs bearing the AIG Marks in any form, a notice to the effect that Defendants have been engaged in selling counterfeit insurance policies and COIs in AIG's name, that the insurance policies the customers purchased are not genuine AIG insurance policies, and that any other documents the customers received from Defendants purporting

to reflect coverage with AIG are fraudulent, with proof of delivery of the same to the Court and AIG; and

4.    Ordering any existing insurance-related materials bearing the AIG Marks or other marks and names of AIG and its affiliates to be turned over to AIG or destroyed.

E.    As further supplemental relief, an award of damages against Defendants in the amount of the total of (i) AIG's actual damages and/or statutory damages at AIG's election (on AIG's claims for violation of 15 U.S.C. § 1114), where any award of actual damages arising from Defendants' violation of 15 U.S.C. §§ 1114 and 1125(a) should be trebled under 15 U.S.C. § 1117; (ii) the profits realized by Defendants by reason of their unlawful acts alleged herein; (iii) punitive and consequential damages; (iv) AIG's reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1117; and (v) prejudgment interest on all amounts;

F.    Such other and further relief as the Court deems just and proper.

### DEMAND FOR A TRIAL BY JURY

AIG demands a trial by jury on all claims so triable.

Dated:  September 30, 2025    Respectfully submitted,

/s/ *Thomas E. Bishop*
Thomas E. Bishop
**BISHOP & PAGE PLLC**
Thomas E. Bishop
*Lead Counsel*
Alexander T. Briggs
Alison Blake
510 North Julia Street
Jacksonville, Florida 32202
(904)-598-0034
tbishop@bishoppage.com
abriggs@bishoppage.com

ablake@bishoppage.com
service@bishoppage.com

**ALSTON & BIRD LLP**
Adam J. Kaiser (*pro hac vice* forthcoming)
90 Park Avenue
New York, NY 10016
(212) 210-9400
adam.kaiser@alston.com

Michael R. Hoernlein (*pro hac vice* forthcoming)
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
(704) 444-1000
michael.hoernlein@alston.com

Daniel F. Diffley (*pro hac vice* forthcoming)
David J. Stewart (*pro hac vice* forthcoming)
Jyoti J. Kottamasu (*pro hac vice* forthcoming)
1201 W. Peachtree Street, Suite 4900
Atlanta, GA 30309
(404) 881-7000
dan.diffley@alston.com
david.stewart@alston.com
jyoti.kottamasu@alston.com

*Counsel for Plaintiff American International Group, Inc.*